IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 25, 2011

## STATE OF TENNESSEE v. WAYNE C. BURKHART, JR.

**Appeal from the Criminal Court for Claiborne County**
**No. 13,327     E. Shayne Sexton, Judge**

---

**No. E2010-00717-CCA-R3-CD - May 11, 2011**

---

A Claiborne County Criminal Court jury convicted the defendant, Wayne C. Burkhart, Jr., of three counts of aggravated child abuse, 11 counts of rape, and 11 counts of incest, and the trial court imposed a total effective sentence of 50 years' incarceration. In this appeal, the defendant challenges the sufficiency of the convicting evidence, the trial court's denial of his motion for a mistrial, and the propriety of consecutive sentencing. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Steve Sams, Knoxville, Tennessee (on appeal); R. B. "Buddy" Baird, III, Rogersville, Tennessee (at trial), for the appellant, Wayne C. Burkhart, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William Paul Phillips, District Attorney General; and Amanda Sammons, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In December 2007, the Claiborne County grand jury returned a 41-count indictment charging the defendant with five counts of aggravated child abuse, 14 counts of rape, and 14 counts of incest and the defendant's wife, Rebecca Lynn Burkhart, with eight counts of aggravated child abuse for their treatment of the victim, the defendant's daughter,

M.B.[1]  The charges related to the defendant's sexual abuse of the victim over a three-year period and his use of a "shock collar" to discipline the victim.

At trial, 18-year-old M.B. testified that the defendant began sexually abusing her when she was 14 years old and the family was living in Montana.  The family, which included the defendant, his wife, and five children, moved to a home on Shady Rest Lane in Claiborne County in 2005 when the victim was 15 years old.  The victim recalled that when the family lived on Shady Rest Lane, the defendant raped her vaginally two times inside a vacant cabin adjacent to the family residence, three times inside the family residence, two or three times on a four wheeler in the woods behind the home, at least once inside an abandoned barn on top of some dog food bags, and once inside the cab of his truck.  The victim testified that the defendant wore a condom during every sexual encounter and that he disposed of the condoms because he did not want his wife to discover the sexual activity.  She recalled that following their encounters, the defendant "would just stand up, pull his pants back up and walk off and say, 'Make sure there's no condom wrappers.'"  The victim said that she did not ever try to resist the defendant because on the only occasion that she had done so, when the family lived in Montana, he had responded by beating her severely.

In May 2006, the family moved from Shady Rest Lane to a mobile home on McMurray Lane.  The victim recalled that just before the family moved, the defendant asked her to accompany him to the new residence to help him clean it up in preparation of the move.  She said that while at the mobile home, he raped her in the hallway between the master bedroom and master bathroom.  She said that on another occasion at the McMurray Lane residence, she asked the defendant if she could spend time with a boy, and he forced her to have sex with him in the woods before he would assent.  She said that the defendant took her into the woods, made her "prop" her hands on a tree, and entered her from behind.

The victim recalled that on another occasion while the family lived at the McMurray Lane residence, her stepmother had taken the three youngest children somewhere while the victim, her older sister, A.B., and the defendant remained at the residence.[2]  The defendant raped her twice in the master bedroom while A.B. watched for their stepmother's return.  The defendant also raped the victim in the master bedroom of the McMurray Lane residence on one occasion while the victim was menstruating.  The victim said that the defendant told her she "was a good girl" and that sex with her was better than it was with A.B.

---

[1]As is the policy of this court, we will refer to the minor victim by her initials.

[2]Like M.B., A.B. had attained adulthood by the time of trial.  Because the allegations concern acts perpetrated on her during her minority, however, we will refer to her only by her initials.

The victim testified that on another occasion when the family lived at the McMurray Lane residence, likely in the fall or summer, the defendant raped her on the "dump bed" of his red four wheeler in the woods next to a stand of blackberry bushes. The victim stated that sex with the defendant was extremely painful. She compared the pain to her "insides . . . being ripped out." She said the final instance of penetration occurred in the master bedroom of the McMurray Lane residence approximately one month before she reported the abuse.

The victim recalled that on some occasions, the defendant forced her to wear her stepmother's lingerie and that the defendant sometimes gave her alcohol to help her relax. She said that the defendant justified his actions by claiming that he had doubts that she and A.B. were his biological children, by claiming a Biblical precedent for incest, and by claiming he needed to teach them "how to keep a man." She stated that the defendant told her "he would never go to jail" for raping her because he knew several "really big people" who "could keep him from getting into trouble." He nevertheless told her that if she reported the abuse, he would kill her and then himself. She recalled that on one occasion, he went so far as to threaten her with a gun.

The victim testified that around the time she turned 17, the defendant began pressuring her to get pregnant by a boy her age so that he could have a grandchild and so that he would not have to use a condom when they had sex. She said her stepmother helped both her and A.B. determine when they were ovulating so that they could time intercourse for their times of optimum fertility. She testified that the defendant told her she "would be good money because [she] could get welfare and . . . child support."

The victim testified that after she went on a date with a boy her age, the defendant took her into the bathroom and "stuck his hands down in [her] pants and pulled it back out to see if there was . . . stuff down there. . . . to see if he could see if [she] actually had sex or not." She said that she and the boy engaged in sexual intercourse but that she had asked him to wear a condom so that she would not get pregnant. She nevertheless told the defendant that the boy had not worn a condom because she did not want the defendant to be angry with her. She said that her stepmother forced her to take a pregnancy test two weeks later and that, when the test was negative, the defendant was angry at her.

The victim testified that on September 9, 2007, the defendant had gone on a camping trip and that she had gone to a football game. When she got home, the defendant telephoned the residence and asked her, "Have you done anything that I should know about?" She responded that she had not, and the defendant hung up. He called back approximately one hour later and claimed that he had spoken to a friend of hers who had told him that the victim claimed the defendant provided her with alcohol. The victim denied having said

anything to the friend. The victim testified that when the defendant returned to the residence a short time later, he accused her of lying and forced her to put a "shock collar" around her neck. The victim explained that the defendant ran a business training hunting dogs and that he used the collars to train the dogs. She said that the defendant had forced her to put the collar around her leg as punishment on two earlier occasions. On those occasions, the defendant had slowly increased the voltage used on the collars until she admitted wrongdoing and expressed remorse for her actions. She described the pain as unbearable. The victim said that September 9 was the first time the defendant had made her put the collar around her neck and that he continued to increase the intensity of the shock when she would not confess that she was lying to him. Describing the pain she said, "It - - it hurt so bad that I - - all I saw was black."

After her stepmother told the defendant to stop, the defendant removed the collar and ordered the victim to "run him a tub of water." She said that he came into the bathroom and told her, "You're never going back to school." He also threatened her with a gun and asked if she had reported the abuse. She said she had not, and he said if she did "he would kill [them] both."

The victim said that the defendant first used the shock collar as an implement of punishment approximately one month before the September 9, 2007 incident. She recalled that the first time he used the collar, the defendant ordered her and A.B. to put the collars around their legs when they failed to clean their room as he had directed. The victim testified that she begged the defendant not to shock her, but he said, "I've told you'ns [sic] over and over again to keep your room clean." She said the defendant held the button down and sat on the couch watching the girls scream and writhe in pain. On the second occasion, the defendant found dog droppings inside a shirt and accused the girls of having used the shirt to clean up their puppy's mess. The victim said that the defendant again told them to put the collars around their legs and shocked them repeatedly until one of them finally admitted using the shirt to clean up after the dog. She said the defendant used the shock collar on her leg a total of four times and on her neck one time.

The victim acknowledged that the defendant was hospitalized at some point after his pacemaker malfunctioned and that he remained hospitalized for approximately four weeks. The victim said she was happy when her father was in the hospital because she "could live a normal life." The victim acknowledged that she did not use the opportunity afforded by the defendant's hospitalization to report the abuse because there was "no doubt in [her] mind" that "then somebody's life would have been in danger." The victim admitted writing letters to her father during his hospitalization saying that she loved and missed him. She clarified that she only wrote the letters because her stepmother directed her and the other children to do so.

-4-

The victim said that on September 10, 2007, she resolved to never return to her parents' residence. She said that she intended to go live with a friend and that she had gone so far as to ask the friend if she could do so. She recalled that, as she thought about the plight of her younger sister, she decided to report the abuse, initially telling her friend and later telling school officials.

James Geiger, an electrical engineer employed by the City of Knoxville, testified as an expert that the human heart could withstand 100 milliamps of electrical current "without going into fibrillation." He explained that a milliamp is "one-thousandth of an ampere" and that "[a]n ampere is the amount of current that flows through an electrical circuit when a switch is closed or the circuit is completed." Mr. Geiger testified that "[r]esistance is the natural impedance of the circuit that resists the flow of current" and that resistance "is measured in ohms."

Mr. Geiger testified that he examined the electronic dog collars provided to him by the Claiborne County Sheriff's Department and that the collars each had "two little contact points . . . that are normally on the animal's neck." Each collar had a transmitter that conveyed a signal to the collar to provide a shock on one of six different levels of intensity. Mr. Geiger said that he tested the voltage of the collars using a special meter designed for electrified fence because the voltage of the collars was too high to be measured by a "normal volt meter." He stated that the training level, level "T," produced only a sound but no voltage. The first setting produced less than 600 volts, the second 600 volts, the third 1,000 volts, the fourth 2,000 volts, the fifth 3,000 volts, and the sixth 5,000 volts. Mr. Geiger explained that even the lowest setting on the collars produced a high voltage. He noted that the manufacturer of the collars had, via their design, limited the available current for each collar to 40 milliamps. He said that "the design of the circuitry in the collar is such that the collar only shocks for 12 seconds unless the button is pressed again. In other words, one press of the transmitter causes the collar to activate for 12 seconds."

Mr. Geiger said that in order to calculate the amount of current that could be generated against human skin, he consulted with Knox County Chief Medical Examiner Doctor Darinka Mileusnic-Polchan to determine "the normal resistance of the skin." Mr. Geiger said that from his examination of the collars it was his opinion "that to receive a shock from this particular dog collar or instrument would be very painful either to a person or to an animal."

Doctor Mileusnic-Polchan testified that electric shock can produce damage to the skin and pain as well as disturbance to heart and brain function. Doctor Mileusnic-Polchan identified a photograph of the victim's calf that included a "superficial tissue injury" to the skin of the calf. She said that the amount of pain caused by the infliction of such an

injury would depend upon the stimuli. Regarding electric shock, she explained that the voltage, the resistance of the skin, including whether the skin was wet or dry, and the duration of the application of stimuli would all affect the perception of pain. She explained that she tried to determine the amount of pain inflicted by the shock collars and that she performed her calculations assuming that the victim's skin was of average thickness and dry at the time of the shock. Using those assumptions, she determined that the 40 milliamps created by the collar would have caused muscle changes "such as maybe contraction, spasm" and even paresthesia, which she described as "the very uncomfortable tingling sensation that lasts because of the prolonged stimulation of the nerve endings of the skin." She said that application of 40 milliamps to the neck was "very dangerous" because of the proximity of the electric current to the "major cranial nerves" and the spinal cord.

Doctor Mileusnic-Polchan explained that electric current changes "the very structure of the ions that are traversing the membrane" of the nerve and that such a change "takes a while to go back to normal." She said that pain perception starts at three to five milliamps. In summary, Doctor Mileusnic-Polchan opined that the shock created by the application of the dog collar to the victim's leg and neck "was definitely painful."

The victim's younger brother, E.B., testified that he had observed the defendant use the shock collar to discipline both the victim and A.B. He recalled that on September 9, 2007, after he and the defendant returned from a weekend hunting trip, the defendant sent the younger children to their rooms because the victim was in trouble. Using a "dog tag" necklace given to him by his mother as a small mirror, E.B. observed the defendant place the collar around the victim's neck and shock her until she cried and screamed, "I can't breathe. I can't breathe." E.B. testified that although he had never seen the defendant sexually assault the victim, the defendant would occasionally order the three youngest children outside while he and the victim remained inside the family residence. E.B. confirmed that the defendant often told both the victim and A.B. that he wanted them to give him "grandbabies cause he thought he was gonna die soon." E.B. said that he initially denied any abuse when questioned by Department of Children's Services ("DCS") investigators because the defendant had told the children that if they reported "anything that [they] saw" they would "get in really big trouble."

E.B. recalled that on their September 2007 hunting trip, the defendant had carried and later utilized a "climber" tree stand to hunt deer.

Doctor Mary Campbell of East Tennessee Children's Hospital interviewed the victim on September 14, 2007, following her report of sexual abuse. Doctor Campbell recalled that the victim's primary concern was whether she had contracted a sexually transmitted disease. Doctor Campbell confirmed that the victim reported having had a sexual

relationship with her father over a long period of time and that he had used condoms during their sexual encounters. Doctor Campbell testified that the victim's gynecological examination was within normal limits. During the examination, the victim was experiencing residual pain in her neck and calf related to the shock administered by the defendant. Doctor Campbell said that she observed an area of "diffused" bruising on the victim's calf in the location she reported being shocked. Doctor Campbell photographed the injury.

The State rested, and the defense called DCS investigator Karen Bailey, who interviewed each of the Burkhart children after the victim made the allegations of abuse. Ms. Bailey testified that she interviewed the victim and the three youngest Burkhart children, E.B., J.B., and C.B., at school on September 10, 2007. She said that she spoke with A.B. later that evening at the Burkhart residence. Ms. Bailey testified that A.B. traveled to the justice center with Claiborne County Sheriff's Department Detective Sam Nelson and was later interviewed in the officers' break room. Ms. Bailey described A.B. as "upset, sometimes hysterical." Ms. Bailey denied threatening A.B. but confirmed that she told A.B., who was an adult, that the failure to report child abuse was a crime.

During cross-examination, Ms. Bailey testified that she was initially "skeptical" of the victim's claims. She said that during her interview, the victim "was breathing hard, wringing her hands, nervous, crying. She appeared to be afraid." Ms. Bailey said that she came to believe the victim when the victim consistently told the same story regarding the abuse. She said that E.B.'s confirming the use of the shock collars also lent credibility to the victim's account of the abuse.

Sam Mars, Jr., a long-time friend of the defendant, testified that he helped set up the defendant's dog training business and had provided the family with the McMurray Lane property as a place of residence and a location for the business. Mr. Mars said that the defendant was a good father and a good person. He testified that he would believe anything the defendant said under oath and that he simply did not believe the allegations against either the defendant or his wife. Mr. Mars said that the defendant had significant health problems that made him very weak in both 2005 and 2006. The defendant was hospitalized in September 2006 and remained in the hospital until around Christmas that year.

Mr. Mars acknowledged that he allowed the defendant to spend the night of September 10, 2007, in a motel he owned despite knowing that the defendant was wanted by the police. After both the defendant and his wife were arrested, Mr. Mars posted Ms. Burkhart's bail and provided both Ms. Burkhart and A.B. with jobs in a restaurant he owned. Mr. Mars acknowledged telling the defendant in a telephone conversation that they "needed to get to" E.B. and J.B. before they were influenced by the victim. Mr. Mars said that the defendant was very knowledgeable about the shock collars he used to train bird dogs.

Rebecca Burkhart, the defendant's wife of 18 years, testified that she lived with the defendant, M.B., and A.B., who were the defendant's children from his first marriage, and the couple's three children, E.B., J.B., and C.B., at the McMurray Lane residence. Ms. Burkhart said that she was the only mother that M.B. and A.B. had ever known. When she and the defendant married, he worked hanging drywall. In 1991, the defendant injured himself on the job and continued to suffer residual pain from that injury even at the time of the crimes. Eventually, the defendant had surgery on his back in 2000 or 2001. Despite the surgery, the defendant continued to have severe pain in his back and legs.

Ms. Burkhart testified that the defendant also suffered from heart problems that required the implantation of a pacemaker in 1996. In May 2005, the defendant had surgery to replace the battery in his pacemaker, and complications from that surgery arose in August 2006 that required the defendant to be hospitalized from August 31, 2006, until December 2006. During that hospitalization, the defendant's pacemaker had to be removed and replaced. Following the 2006 hospitalization, the defendant was under the care of a home health nurse and confined to a hospital bed inside his residence. Ms. Burkhart testified that the immobilization occasioned by the heart surgery exacerbated the defendant's prior back injury such that "they were getting ready to put a stimulator in his back to deaden some nerves because of his pain." She said that the "stimulator" surgery was scheduled for September 15, 2007.

Ms. Burkhart testified that, beginning shortly after the pacemaker surgery in May 2005, the defendant "progressively got sick and . . . just felt bad." She said that from that time until his arrest on September 11, 2007, she and the defendant were unable to engage in sexual intercourse because of the defendant's back pain and inability to maintain an erection. Additionally, she said that although the defendant "would try" to work training hunting dogs, she was often forced to take over for him. She said that she fed the dogs as well as trained them and that the children helped her maintain the kennels. Ms. Burkhart said that she "was around" most of the time and that, as a result, there were no occasions when the defendant would have been alone at the residence with the victim and A.B.

According to Ms. Burkhart, on Friday September 7, 2007, the defendant and their two sons left to go on a camping trip, and the victim rode the bus home from school with a friend to spend the night. Ms. Burkhart said that she left early the next morning to join the defendant and her sons at the campsite. She returned home at approximately 6:00 p.m. on Sunday September 9, 2007. At that point, the victim and A.B. were home. The defendant returned home sometime between 9:30 and 10:00 p.m. that evening. Ms. Burkhart denied that the defendant used the shock collar on the victim that evening and maintained that the collars had never been used on any of the children as a means of discipline. Ms. Burkhart claimed that the family would "play[] around with it a little bit" by giving one another "little"

shocks.

That evening, Ms. Burkhart overheard a conversation between the defendant and A.B. regarding the victim's sneaking out with a boy while her parents were away. She said that the defendant confronted the victim, and the victim became upset and "was hollering at him." According to Ms. Burkhart, the confrontation ended when the defendant told the victim to go to her room. The following morning, Ms. Burkhart got the children off to school as usual.

When the children did not get off of the bus as scheduled that afternoon, Ms. Burkhart went to the school looking for them. She recalled that someone at the school told her that the children were in DCS custody, so she drove to the local DCS office. Workers at the DCS office told her to go to the justice center. At the justice center, Ms. Burkhart was interrogated regarding the allegations made by the victim and by the other children. Ms. Burkhart testified that she consistently denied the allegations, even when threatened with jail time herself. She said that there was no way that the defendant had used shock collars to discipline the victim or had sex with her even one time.

During cross-examination by the State, Ms. Burkhart said that she would be surprised to learn that the defendant had, in fact, admitted to DCS that he used the shock collars to discipline both the victim and A.B. Ms. Burkhart maintained the defendant's innocence even after being confronted with his detailed admissions regarding the use of the shock collars.

Doctor Janet Perkey, a specialist in Internal Medicine, testified that she began treating the defendant when he was hospitalized in the fall of 2006. She said that the defendant suffered endocarditis, an infection of the heart, caused by one of the leads in his pacemaker. He spent some time in the intensive care unit followed by some time on the hospital floor. She continued to see the defendant regularly following his discharge from the hospital.

Aside from his heart problems, the defendant suffered from chronic pain and muscle weakness in his back and legs to such a degree that Doctor Perkey believed him to be a viable candidate for the implantation of a nerve stimulator to relieve his dependence on narcotic pain relievers. Doctor Perkey testified that although the defendant never complained of impotence or erectile dysfunction, his condition would have prevented him from doing "the things that are commented on from the 6-07 through 8-07 complaints." She said that she "just couldn't see" the abuse happening as the victim described.

During cross-examination by the State, Doctor Perkey admitted that she could

not comment on the defendant's physical capabilities prior to his 2006 hospitalization. She said that she based her opinion regarding his capability to have sexual relations after the 2006 hospitalization on "his history of a cervical spine disease," "his ongoing chronic low back pain, his weakness," and her concern that he was suffering "a disease process." She conceded that despite the defendant's lower back pain, doctors could discern no "surgical problem" in his lower back. She said that the defendant's condition would not have prevented him from engaging in sexual intercourse in general but that it would have prevented him from having sex "in the positions described" by the victim.

Joyce Willis, a friend of the defendant and his wife, testified that she and her husband, Leslie Willis, had visited the Burkhart family at their McMurray Lane residence "numerous times." On Thanksgiving 2006, during the defendant's hospitalization, Ms. Willis cooked the Thanksgiving meal for the children and then went to visit the defendant in the hospital. Ms. Willis recalled that during their visit with the Burkhart children, the victim "was so distraught over her dad being so sick, she was afraid he wasn't gonna live." Ms. Willis testified that the victim told her that she loved her parents so much that she never wanted to get married or leave home.

Twenty-year-old A.B. testified that on September 8, 2007, the victim returned to the McMurray Lane residence after having spent the night with a friend. A.B. said that later on that evening, she overheard the victim's talking on the phone with a boy and that the substance of the conversation established that the victim had been with the boy without her parents' permission. A.B. said that when the defendant returned home the following evening, she told him about the victim's having been out with the boy. At that point, the defendant took the victim into the master bedroom "to talk to her." A.B. said that the victim started "screaming and hollering" when the defendant told her that she had to break up with the boy. The defendant then telephoned the boy and forbade him from seeing the victim. A.B. testified that later that night, after the girls went to bed, the victim told A.B. that she hated the defendant and wished "he would die." When A.B. told her not to say such things, the victim said, "Well, I'm gonna do whatever it takes to get out of this house."

A.B. maintained that the defendant did not shock the victim with the shock collar on that or any other occasion. She said that the defendant had never used the shock collar to discipline any of the children, including herself. She also denied ever having been sexually abused by the defendant. She claimed that the first time she heard the allegations was when the police arrived at the McMurray Lane residence on the evening of September 10, 2007. A.B. said that Ms. Bailey questioned her briefly at the residence before telling her that they would take her to the justice center to see Ms. Burkhart.

A.B. said that while at the justice center, she was interrogated by both Ms.

Bailey and another DCS worker named Ashley Voiles. A.B. claimed that she initially denied any abuse and continued to do so until threatened with jail time. She said that Ms. Bailey said she "was not listening to [A.B.'s] lying ass" and that Detective Nelson said they were going to put her in jail with three or four other women who would "beat [her] up" and "whip" her. A.B. said that following these threats, she changed her story and told Ms. Bailey that the defendant had been raping her since she was 14 years old. She also told them that the defendant had used the shock collars to discipline her and M.B. A.B. said that none of the claims she made were true and that she made them solely to avoid going to jail. She claimed that after she signed her statement, the officers and Ms. Bailey "were all excited, hooping [sic] and hollering in the hallway" and shouting, "We got a confession."

A.B. said that she went to the DCS office on the following morning for the purpose of making contact with her siblings. While there, she told another DCS caseworker that she had been threatened by Ms. Bailey and that she wanted to change her story. She said that after she changed her story, DCS workers would not permit her to have any contact with her siblings.

A.B. denied all allegations of abuse, both sexual and physical, that the victim had made against the defendant. A.B. said that she had caught the victim having sex with her boyfriend on a four wheeler and in the cabin behind the Shady Rest residence.

A.B. testified during cross-examination that she believed that DCS had fabricated a statement they claimed had been made by the defendant. She said that the DCS workers and all the investigating officers were "liar[s]" and that she was the only person "under oath telling the truth." She stated that she no longer claimed the victim as a sibling "because of what she's done." A.B. said that E.B., who had confirmed the victim's claims regarding the use of the shock collar, was not a liar because he "was made to say what he said."

Despite testifying on direct examination that none of the officers had provided her with *Miranda* warnings on September 10, 2007, A.B. admitted testifying during a deposition and during Ms. Burkhart's bond hearing that Detective Nelson had provided her with the warnings before she made her statement. She also conceded signing the waiver of rights form on that date.

The 38-year-old defendant testified that he obtained custody of M.B. and A.B. following his divorce from their mother in the early 1990s. At that time, he was working as a drywall finisher in Corbin, Kentucky. Within a year, he had married Rebecca Burkhart, and the couple had three more children. In the fall of 1992, he fell from scaffolding at work and suffered an injury to both his upper and lower back. Then, in 1996, he had a pacemaker

implanted to alleviate heart problems. The injury to his back caused residual pain that eventually led him to have surgery on his back in 2000 or 2001. Even after the surgery, he continued to have pain in his lower back and legs. In May 2005, his pacemaker malfunctioned, and he had it replaced. He then developed an infection in his heart from one of the leads to the pacemaker that required him to be hospitalized for several months in the fall and winter of 2006. Following his hospitalization, he was confined to a hospital bed inside his home, which exacerbated his existing back and leg pain. Because of his health problems, he and his wife were unable to engage in sexual intercourse. The defendant said that although the couple regularly attempted sexual relations, "there was [a] time that [they] could not do nothing" because he was in so much pain. The defendant denied ever raping the victim, explaining that sexual intercourse was nearly impossible for him because of his health problems.

The defendant testified that in the early fall of 2007, the victim began "getting a little boy wild." He said that he talked to her about her attitude because he wanted her to go to college and have a bright future. The defendant said that he did not want the victim to get married young or to get pregnant as a teenager. He denied ever telling the victim that he wanted her to get pregnant and provide him with grandchildren.

According to the defendant, he took E.B. and J.B. on a combined hunting and fishing trip on September 7, 2007, and returned on September 9, 2007, in the late evening. When he returned home, he discovered that the victim had lied to him. He said that he learned that she had gone to see a boy he had forbidden her from having any contact with. The defendant stated that he told the victim that she would be grounded and once again forbade the relationship. The defendant denied striking the victim or using the shock collar to discipline her. He further denied ever having used the shock collar as a method of discipline, saying, "I have never in my life ever put shock collars on my kids, never." He admitted that he did ask the victim to draw him a bath after their confrontation.

The defendant testified that following his arraignment on the charges in this case, he was taken into a room to be interviewed by Ms. Bailey and Ms. Voiles. The defendant said that the women did not provide him with any *Miranda* warnings. He said that during the interview, he denied all of the allegations levied by the victim. He denied providing a statement admitting that he had used the shock collars to discipline the victim. He said that he was not asked to review any statement and that he did not sign anything. The defendant said that, on the advice of his attorney, he had never given a statement to either the police or to DCS concerning the allegations made by the victim.

At the conclusion of the defendant's testimony, the defense rested, and the State commenced its rebuttal proof.

-12-

Doctor Carroll Rose, an expert in the field of general surgery, testified that "no medical fact in the multiple evaluation[s] from neurologists, cardiologists or other people" supported Doctor Perkey's conclusion that the defendant would have been unable to perpetrate a rape of the victim on his four wheeler. On the contrary, Doctor Ross opined that "absolutely, he would be capable of doing that." Doctor Ross added that none of the medications prescribed to the defendant would have caused impotence or erectile dysfunction. Doctor Ross testified that despite numerous evaluations by very competent neurologists and other specialists, practitioners could discern no cause for the defendant's complaint of chronic pain.

Captain Sam Nelson of the Claiborne County Sheriff's Department, who responded along with Ms. Bailey to the victim's high school following her complaint about the defendant's abuse, testified that after placing the children into protective custody, he returned to the justice center where he encountered Ms. Burkhart later that day. Captain Nelson said that he attempted to speak to Ms. Burkhart about the victim's allegations, but she responded, "'I'm not gonna tell you a f****** thing.'" Captain Nelson denied threatening Ms. Burkhart with jail should she refuse to answer his questions, but he acknowledged that he did place her under arrest later that evening. He also denied ever threatening A.B. as she had claimed. Captain Nelson said that he did not try to coerce either woman to provide a statement against the defendant.

Troy Poore, principal of Cumberland Gap High School, where both A.B. and the victim had attended high school, testified that A.B.'s reputation for "truthfulness within [the] school is not very good." In contrast, the victim "had a very good reputation" for truthfulness within the school.

Ashley Voiles of DCS testified that she participated in the investigation of the charges against the defendant. Ms. Voiles said that, when she first met A.B. at the Burkhart residence on September 10, 2007, A.B. "was very upset, almost hysterical." After a brief conversation, A.B. was transported to the justice center. Upon A.B.'s arrival at the justice center, "her emotions changed. She went from being very hysterical to being very angry to being calm." Ms. Voiles said that A.B. never asked to see Ms. Burkhart as she had claimed during her trial testimony and, in fact, had "refused to see her." Ms. Voiles stated that neither she nor Ms. Bailey threatened A.B., but she admitted that A.B. "was told . . . that because she was an adult that she was required to report child abuse and neglect and that . . . by not doing so, she could be held liable." According to Ms. Voiles, after giving a statement that the defendant had been sexually abusing her since she was 14 years old, A.B. "was calm."

Ms. Voiles said that she and Ms. Bailey spoke with the defendant while he was in jail, and "he reported two separate incidences specifically with [the victim] but also

disclosed that he had shocked both [A.B.] and [the victim] as a form of discipline." The defendant said that he "placed the collar midcalf around their leg[s]." According to Ms. Voiles, the defendant told them that the first incident of shocking the victim came after she "snuck out of the home and had had sex with a boy." Ms. Voiles said that he told them that the second incident occurred on September 9, 2007, after the defendant discovered that the victim had gone to a ball game without permission. Ms. Voiles recalled that the defendant admitted referring to his daughters "as beautiful, pretty and sexy." She said that the defendant denied ever raping either of his daughters.

Ray Lawson, an officer with the Kentucky Department of Fish and Wildlife, testified that he and the defendant had been friends for just over three years "prior to [the defendant's] arrest." During that time, he and the defendant went hunting and fishing, and Mr. Lawson occasionally helped the defendant in his dog training business. Mr. Lawson said that during that time he had seen the defendant ride a four wheeler and shoot a crossbow. Mr. Lawson testified that other than the time he was hospitalized, the defendant continued to train hunting dogs. During the preparation of the McMurray Lane property for the installation of the defendant's mobile home, Mr. Lawson observed the defendant's "[o]perating a chain saw" and "dragging limbs for burn piles."

Fourteen-year-old J.B., the victim's brother and the defendant's son, testified that on September 9, 2007, the defendant "stuck the shock collar on [the victim's] leg and shocked her" because she "had done something wrong." J.B. also recalled having observed the victim being shocked on a second occasion. J.B. said that he overheard the defendant telling the victim that he wanted her "to give him a grand baby." J.B. said that he willingly provided a statement to DCS workers and that no person from either DCS or the sheriff's department threatened him in any way.

Following J.B.'s testimony, the State rested and dismissed counts four, eight, 18, 19, 24, 25, 36, and 37. The State also elected the act upon which it intended to rely for conviction in each count, *see State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999) ("[W]hen the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought."), and the trial court read the election of offenses to the jury. The election provided the following:

| Count | Factual Basis |
|-------|---------------|
| 1 | Between August 1, 2007, and August 12, 2007, the defendant "used an electric dog shock collar to shock [the victim] on the leg approximately two or three times in [the] living room of the residence of 161 McMurray Lane." |

-14-

| | |
|---|---|
| 5 | Between August 17, 2007, and September 1, 2007, the defendant "used an electric dog shock collar to shock [the victim] on the leg multiple times in the living room of the residence at 161 McMurray Lane." |
| 11 | On September 9, 2007, the defendant "used an electric dog shock collar to shock [the victim] on the neck approximately three times in the living room of the residence at 161 McMurray Lane." |
| 14 | In the winter of 2005/2006 the defendant "did sexually penetrate [the victim] with his penis in the cabin located behind the house at 210 Shady Rest." |
| 15 | concomitant incest count for count 14 |
| 16 | Sometime between January 2005 and May 2006 the defendant "did sexually penetrate [the victim] with his penis while wearing a condom in a Chevy truck parked near the house at 210 Shady Rest." |
| 17 | concomitant incest count for count 16 |
| 20 | Between May 2005 and August 2005 the defendant "did sexually penetrate [the victim] with his penis in the woods near 210 Shady Rest after the defendant had the victim ride with him on the yellow Suzuki four-wheeler." |
| 21 | concomitant incest count for count 20 |
| 22 | Between May 2005 and August 2005 the defendant "did sexually penetrate [the victim] a second time with his penis in the woods near 210 Shady Rest after [the] defendant had the victim ride with him on the yellow Suzuki four-wheeler." |
| 23 | concomitant incest count for count 22 |
| 26 | Between May 2005 and August 2005 the defendant "did sexually penetrate [the victim] with his penis while wearing a condom in barn at 210 Shady Rest." |
| 27 | concomitant incest count for count 26 |
| 28 | In May 2006 the defendant "did sexually penetrate [the victim] with his penis while wearing a condom in the hallway between the master bedroom and master bath at 161 McMurray Lane." |
| 29 | concomitant incest count for count 28 |
| 30 | Between May 2006 and August 2006, the defendant "did sexually penetrate [the victim's] vagina with his fingers and also his penis in the master bedroom at 161 McMurray Lane." |

| 31 | concomitant incest count for count 30 |
|---|---|
| 32 | In February or March 2007 the defendant "did sexually penetrate [the victim] with his penis while wearing a condom in the master bedroom at 161 McMurray Lane while the victim was on her menstrual period." |
| 33 | concomitant incest count for count 32 |
| 34 | Between June 2007 and August 2007 "while school was out and blackberries were in season [the defendant] did sexually penetrate [the victim] with his penis in the woods near a blackberry patch at 161 McMurray Lane." |
| 35 | concomitant incest count for count 34 |
| 38 | In July 2007, "about midday in the woods at 161 McMurray Lane [the defendant] did sexually penetrate" the victim "on the red Arctic Cat four-wheeler in the woods." |
| 39 | concomitant incest count for count 38 |
| 40 | In August 2007 the defendant "did sexually penetrate [the victim] with his penis in the master bedroom at 161 McMurray Lane.  The defendant . . . ripped the victim's shorts and penetrated her twice with his penis." |
| 41 | concomitant incest count for count 40 |

On the basis of this proof, the jury convicted the defendant as charged of three counts of aggravated child abuse, 11 counts of rape, and 11 counts of incest.  Following a sentencing hearing, the trial court imposed a total effective sentence of 70 years' incarceration.  Later, the trial court amended the total effective sentence to 50 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.  In this appeal, the defendant challenges the sufficiency of the convicting evidence, the trial court's denial of his motion for a mistrial, and the propriety of consecutive sentencing.  We will consider each claim in turn.

*I.  Sufficiency*

The defendant challenges the sufficiency of the convicting evidence for his convictions of rape and incest, arguing that the victim's testimony regarding the offenses was "too vague to distinguish the described incidents as the individual incidents described in each

of the rape and incest charges."[3]  The State contends that the evidence was sufficient to support each of the defendant's convictions.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003).  This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655.  Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.  *Id.*

Rape, as charged in this case, "is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim" where "[f]orce or coercion is used to accomplish the act" or "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent."  T.C.A. § 39-13-503(a)(1)-(2) (2003).  "A person commits incest who engages in sexual penetration as defined in § 39-13-501, with a person, knowing such person to be, without regard to legitimacy . . . [t]he person's child."  *Id.* § 39-15-302(a)(1).

The victim testified that the defendant began sexually abusing her when the family lived in Montana and that he continued to do so on nearly a weekly basis following their move to Tennessee in 2005.  Specifically, the victim testified that, while the family lived in their Shady Rest residence, the defendant penetrated her vaginally inside a vacant cabin adjacent to the family residence, inside the family residence, on a four wheeler in the woods behind the home, inside an abandoned barn, and inside the cab of his truck.  In addition to these offenses, the victim testified that, while the family lived on McMurray Lane, the defendant sexually penetrated her in the hallway between the master bedroom and master bathroom of their residence, in the woods, on the "dump bed" of his red four wheeler

---

[3]The defendant does not challenge the sufficiency of the evidence supporting his convictions of aggravated child abuse.

in the woods next to a stand of blackberry bushes, and three times in the master bedroom, including one occasion when she was menstruating. Although the victim was not able to provide a precise date for the offenses, she narrowed the time frame for each incident using the location of the family's residence, the beginning of school, and the seasons. She further narrowed the description of the offenses using the time of day and the location of each offense. The victim's testimony regarding the incidents aligned with the charges included in the indictment as well as the State's election of offenses. In our view, the victim's testimony, which was accredited by the jury, supports the convictions of rape and incest.

## II. Request for Mistrial

The defendant next contends that the trial court erred by denying his request for a mistrial after the prosecutor asked an improper question during its cross-examination of defense witness Sam Mars, Jr. The State asserts that the trial court did not abuse its discretion by denying the defendant's motion and that the court's curative instruction sufficiently remedied any error occasioned by the question.

The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009); *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Accordingly, this court will disturb the trial court's ruling in this regard only when there has been an abuse of the trial court's discretion. *See Nash*, 294 S.W.3d at 546; *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

"Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The burden of establishing the necessity for mistrial lies with the party seeking it. *Id*. "In making the determination whether a mistrial is warranted, 'no abstract formula should be mechanically applied[,] and all circumstances should be taken into account.'" *Nash*, 294 S.W.3d at 546 (quoting *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993) (internal quotation marks and citation omitted)).

In this case, the following colloquy occurred during the State's cross-examination of Mr. Mars:

> [Prosecutor]: Now, . . .Mr. Mars . . . . You said with regard to [the defendant's] reputation, quote, 'I would absolutely believe anything he said.' Isn't that what you said?
>
> [Mr. Mars]: He has never told me anything that I would doubt.
>
> [Prosecutor]: Well, let me ask you this, [Mr. Mars]. Did you know that when [M.B.] was ten months old and [A.B.] was two years old, that [the defendant], your friend, kidnapped them from their biological mother?

The defense objected, and the trial court held a hearing outside the presence of the jury. During the hearing, the trial court admonished the prosecutor for asking a question that was "way out of line." The court went on,

> [O]f all the things this [c]ourt can do, declaring a mistrial is the greatest travesty, but if I feel like this [j]ury has been tainted to the point that they will not try the issues at hand, then I'll do it and we'll start all over. But now, this has gotta end, this . . . poisoning on both sides, preventing this [j]ury from doing what they're here to do. They've been patient, they have listened, and we're ruining the record for them. Has anyone bought into the idea that . . . the ones with legal knowledge have the responsibility of protecting the record[?] And it's not about winning or losing, it's about doing it right. Winning/losing, they'll decide. But we, as the lawyers and the [j]udge, are supposed to make sure this record is correct and we're not putting things in that have no business being in the record.

At that point, the trial court took a recess to consider the defendant's motion. When court reconvened, the trial court denied the defendant's motion but admonished the parties, stating,

> One more problem and I'm declaring a mistrial. One more. The rules of evidence - - the rules of [c]ourt apply here. I don't make them up. . . . [B]ut we're gonna live by them. I know them. I suggest that you do.

-19-

. . . .

[Y]a'll have your own strategic ideas about how to try the case.
. . . But . . . whatever strategies that you employ, you will do it
within the rules of evidence. And they are here to protect this
record and protect you all. I didn't make them up, and you all
aren't going to rewrite them.

After the jury returned to the courtroom, the trial court provided the following curative
instruction:

There was a statement made by . . . the State's
attorney asking this question concerning an allegation of a
kidnapping, a legal term. This is not about a kidnapping case,
and this [c]ourt [is] striking any reference to that from the
record, and . . . what I'm doing right now is what we call a
curative instruction. I am telling you that you are not to place
any significance on that comment. That is not part of this case,
and any reference to prior crimes can only be considered if I tell
you it can be considered. There are certain situations where
prior behavior might be relevant. That remark did not . . . refer
to one that is relevant. Do you understand that? I'd like a show
of hands of all those that understand what I'm saying.

Let the record show that all the members of the
panel have heard what I have said.

The State concedes, and we agree, that the prosecutor's question touched upon
irrelevant, prejudicial material. We also agree with the State, however, that the curative
instruction issued by the trial court in this case rectified the error occasioned by the
inappropriate question. The curative instruction was very thorough, and the members of the
jury indicated their understanding and assent immediately following the instruction. Under
these circumstances, we cannot say that the trial court abused its discretion by denying the
defendant's motion for a mistrial.

*III. Sentencing*

In his final claim for relief, the defendant challenges the propriety of
consecutive sentencing in his case, arguing that the "imposition of the rape sentences
consecutive to the aggravated child abuse sentences was improper." The State contends that

-20-

the imposition of consecutive sentencing was appropriate under the terms of Tennessee Code Annotated section 40-35-115.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006).[4] This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court was required to consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

---

[4]The defendant executed a waiver of his ex post facto protections regarding those convictions for offenses that occurred prior to the effective date of the 2005 amendments to the Sentencing Act and agreed to be sentenced under the most recent version of the Code.

At the sentencing hearing, William M. Tillery, a licensed clinical social worker who performed the psychosexual evaluation of the defendant, testified that the defendant presented a high recidivism risk because he was "in total denial." He explained that those offenders "in total denial of guilt when convicted in trial" present the "maximum risk of danger" because they cannot "be rehabilitated." Because the defendant fell into this category of offender, Mr. Tillery recommended that the defendant be incarcerated rather than given a sentence involving release into the community.

M.B. testified that the years of abuse she suffered at the hands of the defendant had caused her to suffer from post-traumatic stress disorder, a conclusion confirmed by psychologist Jessica Mason. M.B. stated that the sexual abuse perpetrated by the defendant had caused her residual emotional problems.

At the conclusion of the proof, the trial court imposed sentences of 10 years for each conviction of aggravated child abuse, 10 years for each conviction of rape, and four years for each conviction of incest. The trial court noted that the defendant was not eligible for probation for his convictions of aggravated child abuse and concluded that neither probation nor any other sentencing alternative was appropriate for his convictions of rape and incest. Finally, the trial court ordered partially consecutive alignment of the sentences as follows:

| Count | Sentence/Alignment |
|-------|-------------------|
| 1 | 10 years |
| 5 | 10 years, consecutive to count 1 |
| 11 | 10 years, consecutive to count 5 |
| 14 | 10 years, consecutive to count 11 |
| 15 | 4 years, concurrent to count 14 |
| 16 | 10 years, concurrent all counts |
| 17 | 4 years, concurrent to count 16 |
| 20 | 10 years, consecutive to count 14 |
| 21 | 4 years, concurrent to count 20 |
| 22 | 10 years, concurrent to all counts |
| 23 | 4 years, concurrent to count 22 |

| 26 | 10 years, concurrent to all counts |
| 27 | 4 years, concurrent to count 26 |
| 28 | 10 years, consecutive to count 20 |
| 29 | 4 years, concurrent to count 28 |
| 30 | 10 years, concurrent to all counts |
| 31 | 4 years, concurrent to count 30 |
| 32 | 10 years, concurrent to all counts |
| 33 | 4 years, concurrent to count 32 |
| 34 | 10 years, concurrent to all counts |
| 35 | 4 years, concurrent to count 34 |
| 38 | 10 years, concurrent to all counts |
| 39 | 4 years, concurrent to count 38 |
| 40 | 10 years, consecutive to count 28 |
| 41 | 4 years, concurrent to count 40 |

The total effective sentence, based upon the alignment of the sentences, was 70 years. The court based the imposition of consecutive sentences on its finding that the defendant had committed "two or more statutory offenses involving sexual abuse of a minor." *See* T.C.A. § 40-35-115(b)(5). The court concluded that there was "ample evidence" that the time period of the defendant's undetected sexual activity was great, that the scope of the sexual acts was vast, and that the victim had suffered from residual physical and mental damage as a result of the abuse.

Following the hearing on the defendant's motion for new trial, the trial court modified the sentence alignment to provide that counts one, five, and 11 are to be served concurrently to each other for a total effective sentence of 50 years' incarceration.

In our view, the record supports the conclusions of the trial court. Code section 40-35-115(b)(5) provides:

> (b)  The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

. . . .

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

T.C.A. § 40-35-115(b)(5). Here, the defendant was convicted of 11 counts of rape and 11 counts of incest based upon nearly three years of undetected sexual abuse perpetrated against his minor daughter, M.B. During that time, he forced her to have sex in several different locations, and the victim likened the abuse to having her "insides ripped out." He also threatened to kill her if she reported the abuse and convinced her that he would not be punished for it. M.B. testified that the abuse had caused her to be diagnosed with post-traumatic stress disorder and had interfered with her romantic relationships. Further, Mr. Tillery classified the defendant as a high risk to recidivate because of his complete denial of culpability. Although the defendant concedes that the application of Code section 40-35-115(b)(5) to the convictions of rape and incest was appropriate, he maintains that section did not authorize consecutive alignment of the aggravated child abuse and rape sentences. He does not, however, support his argument that Code section 40-35-115 is so limited with citation to any relevant authority. Under these circumstances, we will not disturb the ruling of the trial court. *See generally State v. Lane*, 3 S.W.3d 456, 458 (Tenn. 1999) (approving consecutive alignment of convictions of unlawful exercise of official power and rape on the basis of Code section 40-35-115(b)(5)).

## *IV. Conclusion*

Discerning no infirmity in the rulings of the trial court or the sufficiency of the convicting evidence, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-24-